UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| REBECCA BURTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5: 20-280-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ETHICON INC., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Rebecca Burton's pelvic organ prolapse was treated surgically in 2008 using Prolift, a synthetic mesh device manufactured by Defendants Johnson & Johnson and its subsidiary Ethicon, Inc.  Burton claims that she developed pain,  recurring infections, and other complications as a result of having Prolift implanted.  She seeks to recover damages from the defendants.

The defendants have filed a motion for partial summary judgment, which will be granted in part, and denied in part.  And each party has filed a motion to exclude opinions and testimony of the other's expert witness.  Because Burton has raised issues that are more appropriately addressed through cross-examination, her motion to exclude Dr. Nicole Fleischmann's testimony will be denied.  While the defendants' motion to exclude Dr. Daniel Elliott's opinion will be denied, in part, it will be granted to the extent that Elliott offers testimony that has already been deemed inadmissible by the MDL Court or is irrelevant to the plaintiff's claims under Kentucky law.

# I.

## Background

Burton visited gynecologist J. Michael Guiler, M.D., with complaints of vaginal pressure and weakness in 2008.  Guiler diagnosed Burton with perineal relaxation and posterior pelvic organ prolapse ("POP"), which is weakness of the support tissue surrounding the vagina.  [Record Nos. 49-1, p. 75; 15, p. 6]  On February 20, 2008, Guiler treated Burton's POP by implanting the Prolift device at Central Baptist Hospital in Lexington, Kentucky. [Record No. 47-1, p. 4]

Burton claims that she began to experience pelvic pain, mesh erosion, dyspareunia, vaginal scarring, and urinary problems following implantation of the Prolift.  [Record No. 55-1, p. 76]  However, it was not until 2013 that she realized the symptoms were caused by the implant.  *Id.*  Gynecologist Rudy Tovar, M.D., removed portions of the mesh on August 23, 2013, in Lexington, Kentucky.  *Id.* at p. 7.  Burton reported that, after the mesh removal surgery, "the pressure and the pain was relieved somewhat."  *Id.* at p. 40.  As of her September 11, 2019 deposition, she still had frequent pelvic infections, pressure, muscle spasms, and painful sex, which she linked to the remaining pelvic mesh.  *Id.* at p. 79.

Burton filed suit on April 21, 2014, as part of multi-district litigation involving various pelvic mesh devices manufactured by the defendants and others.  [S.D. W.Va. 2: 12-md-2327; S.D. W.Va. 2: 14-cv-15094]  Burton indicated that she wished to proceed against the defendants on all counts raised in the MDL Master Complaint, with the exception of loss of consortium.  The claims include: negligence (count I); strict liability—manufacturing defect (count II); strict liability—failure to warn (count III); strict liability—defective product (count IV); strict liability—design defect (count V); common law fraud (count VI); fraudulent

concealment (count VII); constructive fraud (count VIII); negligent misrepresentation (count IX); negligent infliction of emotional distress (count X); breach of express warranty (count XI); breach of implied warranty (count XII); violation of consumer protection laws (count XIII); gross negligence (count XIV); unjust enrichment (count XV); punitive damages (count XVII); and discovery rule and tolling (count XVIII).  Burton filed an Amended Short-Form Complaint on June 25, 2014, which added her husband Jeffrey Burton as a plaintiff and alleged a claim for loss of consortium (count XVI).[1]

The MDL Court managed discovery and issued various rulings, including some decisions regarding the admissibility of general expert opinions that were common to numerous cases.  On October 18, 2019, the defendants filed a motion for partial summary judgment.  [Record No. 47]  The parties' *Daubert* motions were filed shortly thereafter. [Record Nos. 49, 51]  The MDL Court transferred the matter to this Court on July 1, 2020, and these motions are ripe for consideration.

## II.

**A**s an initial matter, the Court notes that certain aspects of the defendants' motion for partial summary judgment are unopposed.  The defendants have moved for summary judgment with respect to the following claims:  Count I—negligence, to the extent the claim is based on manufacturing defect; Count II—strict liability manufacturing defect; Count IV—strict liability defective product; Count VI—common law fraud; Count VII—fraudulent concealment; Count VIII—constructive fraud; Count IX—negligent misrepresentation; Count X—negligent infliction of emotional distress ("NIED"), to the extent the claim is based on

---

[1]    Jeffrey Burton's claim for loss of consortium is not at issue in the pending motions. Accordingly, any reference to "plaintiff" or "Burton" refers to Rebecca Burton.

negligent manufacturing defect; Count XI—breach of express warranty; Count XII—breach of implied warranty; Count XIII—violation of consumer protection laws; Count XIV—gross negligence, to the extent the claim is based on manufacturing defect; and Count XV—unjust enrichment.  [Record No. 48]

The plaintiff reports that she will not pursue claims based on manufacturing defect, "strict liability-defective product," common law fraud, constructive fraud, negligent misrepresentation, breach of express warranty, or breach of implied warranty.  Accordingly, the plaintiffs are left with claims of negligence based on design defect (Count I); strict liability—design defect (count V); fraudulent concealment (Count VII); NIED, based on design defect (Count X); violation of consumer protection laws (Kentucky Consumer Protection Act) (Count XIII); gross negligence, based on design defect (Count XIV); unjust enrichment (Count XV); and loss of consortium (count XVI).[2]  With these claims in mind, the Court proceeds to the parties' motions to limit or exclude expert testimony.

## III.

### Motions to Exclude Expert Testimony

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

---

[2]     The defendants have not moved to dismiss Counts XVII (punitive damages) (count XVII); and XVIII (discovery rule and tolling).  However, these are not stand-alone claims and will be dismissed as individual counts in the Complaint.  *See, e.g., Cutter v. Ethicon*, 5: 19-cv-443, 2020 WL 109809 (E.D. Ky. Jan. 9, 2020).

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial judge serves as a gatekeeper to determine whether an expert's testimony is reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). When an expert bases testimony on professional studies or personal experience, he or she must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Medical doctors generally are competent to testify regarding matters within the scope of their own professional practice. *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 427-28 (6th Cir. 2009). Determining whether expert testimony should be admitted requires a flexible inquiry and any doubts should be resolved in favor of admissibility. *Daubert*, 509 U.S. at 594.

### A.    Daniel Elliott, M.D.

The plaintiffs retained Daniel Elliott, M.D., to provide general opinions concerning the defendants' mesh products, as well as specific opinions regarding the use of Prolift in Rebecca Burton's case. Dr. Elliott is a urogynecologist and an associate professor of urology at the Mayo Clinic Graduate School of Medicine in Rochester, Minnesota. Elliott did not examine Burton, but relied on her medical records, scientific literature, and his own research and practice experience in forming his opinions.

Elliott provided a report in the MDL that contains general opinions regarding the alleged lack of clinical benefit and complication rate associated with Prolift, as well as Ethicon's alleged failure to disclose the known risks of using Prolift for POP repair. [MDL Record No. 2082-6] The defendants filed a motion in the MDL Court to preclude Elliott from offering certain opinions. While the MDL Court ruled on several issues, it reserved ruling on

some portions of the defendants' motion, concluding that the trial court would be in a better position to determine the admissibility of particular evidence.  [*See* MDL Record Nos. 2666, 4364.]

Elliott also has tendered an expert report providing opinions specific to Rebecca Burton's case.  [Record No. 49-1, pp. 1-64]  The defendants have filed a motion to exclude Elliott's opinions concerning warnings (including the informed consent process); opinions regarding safer alternative treatments and procedures; and "quality of life" opinions.  [Record No. 50]

## 1.    Warning Testimony

The defendants first contend that Elliott should not be permitted to offer opinions concerning what should or should not have been included in Prolift's instructions for use ("IFU").  This issue was previously addressed by the MDL Court, which concluded: "While an expert who is a urologist may testify about the specific risks of implanting mesh and whether those risks appeared on the relevant IFU, the same expert must possess additional expertise to offer expert testimony about what information should or should not be included in an IFU." [MDL Record No. 6409, p. 2]  The Court determined that Elliott, who had never drafted or consulted in the drafting of an IFU, did not possess the additional expertise required to testify about what information an IFU should or should not include.  Therefore, his testimony about such matters was excluded.

The MDL Court's evidentiary rulings are adopted as the law of the case unless the plaintiff can identify extraordinary circumstances showing that the MDL Court's ruling was clearly erroneous.  *See United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990); *Holloway v. Brush*, 220 F.3d 767, 785 (6th Cir. 2000).  While the plaintiff contends that Elliott and

similarly-qualified experts have been permitted to opine regarding the adequacy of product labeling in other cases, she has not established that the MDL Court's narrow ruling was "clearly erroneous or would work a manifest injustice." *See Holloway*, 220 F.3d at 785. Accordingly, the MDL Court's ruling excluding Elliott's opinions regarding the adequacy of Prolift's IFU is adopted herein. *See Wiltgen v. Ethicon, Inc.*, 2017 WL 4467455, at \*8 (N.D. Ill. Oct. 6, 2017) (Elliott was permitted to testify regarding the IFU but testimony was limited to his area of expertise and could not involve legal or regulatory matters).

The defendants also contend that Elliott's warning opinions do not fit the facts of the case because Burton's implanting physician, Dr. Guiler, was aware of the potential risks of the Prolift and did not rely upon the IFU to learn of the risks associated with Prolift surgery. However, Guiler testified that, while he did not "sit down and review [the IFU] before every single surgery . . ., the information within it would have been a part of the—all of the information [he] considered when making a risk-benefit analysis for Ms. Burton."  [Record No. 49-1, p. 81]

One of the plaintiff's theories of liability is that Ethicon minimized the frequency and severity of known risks associated with use of the Prolift.  Elliott's case-specific report indicates that, "throughout Ethicon's IFU documents regarding [Prolift], there is a trend to refer to complications as 'rare'" when they actually are not. *Id.* at p. 51.  Guiler testified that he was aware the risks of vaginal shortening and dyspareunia, but understood these to be "rare" or "uncommon" complications. *Id.* at p. 87.  Had he known at the time of Burton's surgery that painful intercourse was not a rare or uncommon complication, he would have advised Burton accordingly.  And he would have considered that information relevant and significant in weighing the risk-benefit analysis for a patient like Burton.  Accordingly, the defendants

have not shown that Elliott's opinion regarding Ethicon's alleged failure to disclose additional warnings is irrelevant to Burton's failure-to-warn claim. While Elliott is precluded from commenting on "what should or should not" go into an IFU, he has sufficient background and experience to testify regarding information that would be significant for clinical decision-making and informed consent in POP surgery.

### 2. Feasible Alternative Designs

"Kentucky applies a risk-utility test in design defect cases." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 378 (6th Cir. 2014).[3] The applicable test is "whether an ordinarily prudent company being fully aware of the risk, would not have put the product on the market." *Id.* "Therefore, 'design defect liability requires proof of a feasible alternative design.'" *Id. See also Owens v. Ethicon, Inc.*, 2020 WL 1976642, at *3 (E.D. Ky. Apr. 24, 2020) (citing *Bosch v. Bayer Healthcare Pharm., Inc.*, 13 F. Supp. 3d 730, 742 (W.D. Ky. 2014) (plaintiffs must provide "proof of an alternative, safer design that is practicable under the circumstances").[4]

Elliott reports that various alternative designs/procedures are safer than Prolift and that

---

[3]     The parties agree that Kentucky's substantive law applies in this case. [Record Nos. 48, p. 3; 54, p. 3]  Because there is no dispute that Kentucky has the most significant contacts with the events underlying the plaintiff's alleged injuries, the Court will apply Kentucky law. *See Cutter*, 2020 WL 109809 (explaining standard applied in tort and quasi-contract actions).

[4]     Plaintiffs rely on an unpublished Kentucky Court of Appeals decision in support of the proposition that proof of an alternative feasible design is not required to establish their design-defect claim. *See Garlock Sealing Technologies, LLC. v. Robertson*, 2009-CA-000483, 2011 WL 1811683, at *2 (Ky. Ct. App. May 13, 2011).  In that case, the court suggested, but did not decide, that proof of an alternative feasible design is not always needed to prove a claim of strict liability design defect in Kentucky.  But subsequent decisions indicate that proof of an alternative feasible design is required. *See Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 41-42 (Ky. 2004); *Owens*, 2020 WL 1976642, at *3.

the use of these treatment alternatives would have prevented Burton's injuries.  [Record No.

49-1, p. 63]  According to Elliott, these include:

> [t]he use of sutures, including delayed absorbable sutures like PDS, in a uterosacral ligament suspension and a sacrospinous fixation, a colporrhaphy or an abdominal sacrocolpopexy with mesh or biologic products; [f]ascia POP repair with Biologics; and [a] POP repair utilizing a lighter weight, larger pore mesh which does not employ the use of polypropylene mesh arms and/or trocars.

*Id.*

The defendants contend that, to the extent these alternatives constitute non-mesh

products or procedures, the opinions should be excluded because they "do not inform the issue

of whether an alternative design for [Prolift] exists."  [Record No. 50, p. 6]  The Court agrees

that evidence regarding a surgical procedure not involving mesh has no bearing on the

existence of a safer alternative design for the defendants' Prolift product.  Accordingly,

evidence regarding such procedures is not admissible to prove the existence of safer alternative

designs.  *See, e.g., Owens*, 2020 WL 1976642, at *3.

The plaintiffs suggest that evidence of procedures not utilizing mesh for POP repair is

nonetheless admissible to demonstrate Prolift's lack of utility.  However, the plaintiffs have

not identified any authority indicating that non-mesh products or procedures are relevant to

the risk-utility analysis concerning Prolift under Kentucky law.  *See, e.g., Hopkins v. Ford

Motor Co.*, No. 1: 07-CV-068, 2011 WL 5525454, at *2 (W.D. Ky. Nov. 14, 2011) ("The risk-

utility analysis balances the available alternative designs with the risk of the chosen design.").

The plaintiff also contends that Elliott's testimony regarding non-mesh products or

procedures is relevant to "a failure to warn."  However, "a party proffering expert testimony

must show by a 'preponderance of proof' that the expert whose testimony is being offered . . .

will testify to scientific knowledge that will assist the trier of fact in understanding and

disposing of issues relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). This vague description of the relevance of Elliott's proffered testimony is insufficient to establish that it would assist the jury in understanding issues in the case. Accordingly, the plaintiff has not shown that the evidence is admissible for this purpose.

To the extent Burton contends she will rebut testimony that Prolift was the "gold standard" treatment for POP, it is unclear that the defendants intend to present such evidence. If such testimony is presented, Elliott may testify about the alternative non-mesh procedures in rebuttal.

### 3.     Psychological Injury and Quality of Life

Elliott reported that Prolift implantation caused Burton to suffer vaginal and pelvic pain, severe dyspareunia, pelvic floor dysfunction, and recurrent vaginal infections, which caused a severe compromise in her quality of life. [Record No. 49-1, p. 62] The defendants contend that Elliott should be precluded from offering opinions regarding Burton's quality of life because he will simply repeat information that is better presented to the jury by the plaintiff herself.

The parties agree that "[e]xpert testimony which 'merely regurgitates factual information that is better presented directly to the jury rather than through the testimony of an expert witness" should be excluded. *See In re C.R. Bard, Inc.*, 948 F.Supp.2d 589, 608 (S.D. W. Va. 2013). The plaintiff argues that Elliott will offer more than a recitation of Burton's subjective complaints because his opinion "is based on his own review of the literature and experience working with women and treating POP." However, expert testimony regarding diminished quality of life is unnecessary because it is a concept that is understandable to the

average juror. *See id.*  Accordingly, the defendant's motion to exclude this testimony will be granted.

Should the defendants attempt to show that diminished quality of life could not have resulted from the problems alleged by Ms. Burton, Elliott may be permitted to rebut that evidence based on his review of the literature and experience treating patients.  As a urogynecologist with ample clinical experience, he is qualified to comment on quality of life issues associated with these diagnoses.

### 4. Opinions Predicated on General Causation Opinions

The defendants present a conclusory argument that Elliott's case-specific opinions should be limited or excluded because they are based upon his "inadmissible general causation opinions."  [Record No. 50, p. 3]  However, to properly present this issue for the Court's consideration, the defendants were required to expand their argument and identify the precise opinions they believe should be excluded and why.[5]  Because they have failed to do so, the motion will be denied.

Additionally, the MDL Court has pointed out that deficiency of an expert's general causation opinion does not necessarily result in exclusion of that expert's opinions on specific causation.  *See In re Ethicon*, MDL No. 2327, Civil Action No. 2: 12-3074, 2017 WL 2214895, at *2 (S.D. W.Va. May 18, 2017).  The defendants do not address the fact that Elliott has

---

[5]      The MDL Court excluded several of Elliott's general opinions in addition to that regarding the adequacy of Prolift's IFU.  They include:  (1) that mesh should not be used in the vagina on the basis of the material safety data sheet ("MSDS"); (2) testimony linking mesh degradation to clinical harm; (3) opinions regarding Ethicon's successful marketing strategies; and (4) that laser-cut mesh is a safer alternative to mechanical-cut mesh.  [MDL Record No. 2666]

reviewed Ms. Burton's medical records and engaged in differential diagnosis, which ostensibly is sufficient to present an opinion regarding specific causation. *See id.* To the extent the defendants believe there are deficiencies in this testimony, they may be addressed during cross-examination.

### B.      Nicole Fleischmann, M.D.

The defendants retained Nicole Fleischmann, M.D., to offer opinions about the Prolift device and the cause of Burton's alleged injuries. [Record No. 51-1] Fleischmann is a urologist who subspecializes in pelvic floor medicine and reconstructive surgery. The plaintiff argues that Fleischmann should not be permitted to testify or offer opinions that: (1) the Prolift device was not the cause of Burton's injuries and (2) that anxiety and depression were the cause of the injuries as described by Burton as of May 30, 2013.

### 1.      Whether Prolift Caused Burton's Injuries

The plaintiff contends that Fleischmann should not be permitted to opine that Prolift did not cause Burton's injuries because she does not present a reliable differential diagnosis. Specifically, "she did not consider whether the stiffness of the mesh caused [Burton's] injuries." [Record No. 52, p. 4]

The plaintiff's argument regarding the reliability of Fleischmann's differential-diagnosis opinion is not supported by the record. Fleischmann, a urologist with significant clinical experience, relied upon Burton's medical records and deposition testimony in forming her opinions. She noted that Burton's operative notes did not indicate any mesh complications such as exposure, scarring, banding or contraction. [Record No. 51-1, p. 15] Fleischmann also observed that Burton began hormone replacement therapy three years before her implant surgery and was later diagnosed with menopausal vaginal atrophy. *Id.* at p. 19. Additionally,

Fleischmann noted that Burton's obesity and anxiety likely contributed to her pelvic floor dysfunction.

A doctor need not rule out every conceivable cause for her differential-diagnosis-based opinions to be admissible. *Best v. Lowe's Home Ctrs.*, 563 F.3d 171, 181 (6th Cir. 2009). Regardless, the plaintiff has not identified any authority indicating that the *defendants* are required to establish causation by providing a differential diagnosis of Burton's condition. Any alleged deficiencies in Fleischmann's opinions resulting from a failure to consider mesh stiffness may be addressed during cross-examination.

### 2.    Anxiety and Depression as a Cause of Injuries

Fleischmann opined that Burton's dyspareunia was caused by a combination of vaginal atrophy and spasm of the levator ani muscle.  [Record No. 51-2, p. 76]  Fleischmann further noted that Burton's anxiety was a cause of the levator spasm.  The plaintiff contends that Fleischmann should be precluded from presenting this testimony because she has no reliable basis for reaching this conclusion.

Fleischmann's conclusions are sufficiently supported by the record.  Burton testified during her deposition that she was diagnosed with anxiety, depression, post-traumatic stress disorder ("PTSD"), and possibly attention deficit hyperactivity disorder ("ADHD") following the sudden death of her son in 2006.  [Record No. 55-1, pp. 12-13]  She was prescribed Xanax and Adderall that same year.  Burton also began taking Klonopin for anxiety and amitriptyline for depression.  While she discontinued the anxiety medication at one point, she subsequently resumed taking it.  In 2018, Ms. Burton received a service dog to help with the PTSD and anxiety related to her son's death.

Fleischmann testified that she regularly sees women in her practice who have "tenderness on the posterior vaginal wall due to levels of anxiety." [Record No. 51-2, p. 51] Additionally, her report cites various studies linking depression and anxiety with pelvic floor pain and urogenital pain syndromes. [Record No. 51-1, p. 21] Burton's deposition testimony suggests that she experienced depression and/or anxiety (at least intermittently) from 2006 through 2019.

Based on the foregoing, Fleischmann's testimony will aid the jury in understanding a potential cause of Ms. Burton's symptoms other than the Prolift device. Any challenges to Fleischmann's opinions are better suited for cross-examination. Accordingly, the plaintiffs' motion to exclude Fleischmann's opinions will be denied.

## IV.     Motion for Partial Summary Judgment

### A.     Standard of Review

"Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Saunders v. Ford Motor Co.*, 879 F.3d 742, 748 (6th Cir. 2018) (citing Fed. R. Civ. P. 56(a)). The moving party initially bears the burden of demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party has met the initial burden of showing the absence of a genuine dispute of material fact, the non-moving party must then come forward with specific facts showing that there is a genuine issue for trial." *McGee v. Armstrong*, 941 F.3d 859, 868 (6th Cir. 2019).

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the

[nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court views all evidence in the light most favorable to the nonmoving party. *McGee*, 941 F.3d at 868.

## B.     Fraudulent Concealment

The defendants argue that Burton's claim for fraudulent concealment should be dismissed because it duplicates her failure-to warn claim. The defendants rely on a conclusory assertion that the learned intermediary doctrine, which applies in failure-to-warn cases, will be undermined if these claims are allowed to go forward. *See Larkin v. Pfizer, Inc.*, 153 S.W.3d 758, 770 (Ky. 2004) (adopting an exception to general rule that a manufacturer's duty to warn runs to the ultimate consumer). However, the defendants have not explained why this is true and have not cited any Kentucky cases in which fraud claims have been dismissed as "repackaged" failure-to-warn claims.

It is well-established that plaintiffs are free to pursue alternative theories of recovery. Further, as another judge in this district observed, Kentucky law permits plaintiffs to pursue concurrent fraud and failure-to-warn causes of action. *See Corder v. Ethicon, Inc.*, -- F.Supp.3d--, 2020 WL 4194986, at *8 (E.D. Ky. July 21, 2020) (citing *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 568 (6th Cir. 2013)).

The defendants claim that the plaintiff's "common law claims based on fraud," including fraudulent concealment, should be dismissed, nonetheless, because there is no evidence that she relied on a misrepresentation by Ethicon. [Record No. 48, p. 6] To prevail on a claim of fraudulent concealment, or fraud by omission, the plaintiff must prove: the defendant had a duty to disclose the material fact at issue; the defendant failed to disclose the fact; the defendant's failure to disclose the material fact induced the plaintiff to act; and the plaintiff suffered actual damages as a consequence. *Giddings & Lewis, Inc. v. Industrial Risk*

*Ins.*, 348 S.W.3d 729, 747 (Ky. 2011).  The defendants have utterly neglected to make an argument that applies to the elements of fraudulent concealment, instead basing their argument on a claim of affirmative misrepresentation—which Burton is not pursuing.  This Court will not make the defendants' arguments for them.  Accordingly, their motion for summary judgment with respect to the fraudulent concealment claim will be denied.

### C.    Kentucky Consumer Protection Act

The plaintiff asserts a claim for violations of the Kentucky Consumer Protection Act ("KCPA"), which declares unlawful: "Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."  Ky. Rev. Stat. § 367.170.  A private cause of action exists for "[a]ny person who purchases . . . goods . . . primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal" as a result of a violation of the statute.

The defendants contend that this claim must be dismissed because privity of contract is required.  Burton concedes that privity of contract generally is required under the KCPA.  *See Skilcraft Sheetmetal, Inc. v. Kentucky Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. Ct. App 1992).  However, Burton asserts that an exception applies in this case because Ethicon made a warranty "for the benefit of the subsequent purchaser."  *See id.*

*Skilcraft* is the seminal Kentucky case defining the scope of a private right of action under the KCPA and it clearly requires privity.  *See Simpson v. Champion Petfoods USA, Inc.*, 397 F. Supp. 3d 952 (E.D. Ky. 2019).  The court in *Skilcraft* held

> [A] subsequent purchaser may not maintain an action against a seller with whom he did not deal or who made no warranty for the benefit of the subsequent purchaser.  The language of the statute plainly contemplates an action by a purchaser against his immediate seller . . . The legislature intended that privity of contract exist between the parties in a suit alleging a violation of the

Consumer Protection Act.  We find distinguishable situations such as that presented in *Ford Motor Co. v. Mayes*, Ky. App., 575 S.W.2d 480 (1978), where the defendant (Ford Motor Company) provides warranties to the ultimate purchaser to repair the item purchased.

836 S.W.2d at 909.

Burton relies on *Naiser v. Unilever United States, Inc.*, 975 F. Supp. 2d 727 (W.D. Ky. 2013), in which the court "broke ranks" and interpreted the last sentence from the excerpt above to create an exception to the privity requirement.  *See Simpson*, 397 F. Supp. 3d at 962. It does not appear that any judge in this district has applied the exception created in *Naiser* and the undersigned declines to do so now.  *See Keaton v. G.C. Funeral Home, Inc.*, 436 S.W. 538, 546 (Ky. Ct. App. 2013) ("Claims may only be brought under the KCPA by individuals who personally purchase goods or services from a merchant.").

The Court also notes that Prolift is unlikely to be a personal, family, or household good as defined by the KCPA.  Burton has not responded to the defendants' argument that the claim should be dismissed on this basis.  While there does not appear to be any Kentucky authority directly on point, other jurisdictions to have addressed the issue have determined that implanted medical devices and/or devices used by physicians during surgery do not constitute consumer products.  *See, e.g., Collins v. Davol, Inc.*, 56 F. Supp. 3d 1222, 1231 n.9 (N.D. Ala. 2014) (hernia mesh implanted into plaintiff's abdomen was not consumer good); *Herzog v. Arthrocare Corp.*, 2003 WL 1785795 (D. Maine Mar. 21, 2003) (surgical tool used on plaintiff's knee was not consumer good); *Reeves v. PharmaJet, Inc.*, 846 F.Supp.2d 791 (N.D. Ohio 2012); *Kemp v. Pfizer*, 835 F. Supp. 1015, 1024-25 (E.D. Mich. 1993) (surgically implanted medical devices not consumer products under the Magnuson-Moss Act because they "are not customarily available to the ordinary person.").

- 17 -

Based on the foregoing, summary judgment will be granted in the defendants' favor with respect to the plaintiff's claim under the Kentucky Consumer Protection Act.

### D.      Unjust Enrichment

The defendants argue that they are entitled to summary judgment with respect to Burton's claim for unjust enrichment.  To recover on a claim of unjust enrichment, the plaintiff is required to prove the following three elements: a benefit conferred upon the defendants at the plaintiff's expense; a resulting appreciation of the benefit by the defendants; and inequitable retention of the benefit without repayment of its value.  *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 777-78 (Ky. 2017).  In support of their motion for summary judgment, the defendants contend simply that the plaintiff's allegations "sound in tort, rather than contract or quasi-contract, and she cannot prove that Ethicon inequitably retained a benefit conferred by her."  [Record No. 48, p. 9]

For her part, Burton responds that the defendants' argument in support of summary judgment does not meet their burden under *Celotex*.  Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no issues of material fact regarding an essential element of the non-moving party's claim.  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009).  This is not accomplished by "emphatic say-so" or conclusory allegations that the plaintiff has no evidence to prove her claim.  *Sideridraulic Sys. SpA v. Briese Schffahrts GmbH & Co. KG*, No. 10-715, 2011 WL 3204521, at *2 n.3 (S.D. Ala. July 26, 2011) (citing *Mullins v. Crowell*, 228 F.3d 1305, 1303 (11th Cir. 2000)).  Instead, the movant must demonstrate that the available evidence establishes that there is no genuine issue of material fact.  *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 554 (6th Cir. 2009); *Hem v. Toyota Motor Manuf.*, 09-CV-888, 2010 WL 11434981 (D. N.M.

- 18 -

Dec. 12, 2010) (defendant discharges initial burden by "showing" absence of material fact, not "asserting" the absence thereof).

The movant may fulfill this burden by making "reference to materials on file," and by pointing out the absence of specific facts that are required for the success of the plaintiff's claim. The defendants' undeveloped argument did not trigger Burton's obligation to respond with facts showing a triable issue on the unjust enrichment claim. *See Corder*, 2020 WL 4194986, at *14. Accordingly, the Court will deny summary judgment with respect to this claim.

## V.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.      The defendant's motion for partial summary judgment [Record No. 47] is **GRANTED**, in part, and **DENIED**, in part.

2.      The Court dismisses Counts II (strict liability manufacturing defect), IV (strict liability defective product), VI (common law fraud), VIII (constructive fraud), IX (negligent misrepresentation), XI (breach of express warranty), XII (breach of implied warranty), XIII (violation of KCPA), XVII (punitive damages), and XVIII (discovery rule and tolling). The plaintiffs may proceed with the remaining claims.

3.      The defendants' motion to limit the case-specific opinions of Daniel Elliott, M.D. [Record No. 49] is **GRANTED**, in part, and **DENIED**, in part, consistent with this Memorandum Order and Opinion.

4.      The plaintiff's motion to limit the case-specific opinions of Nicole Fleischmann, M.D. [Record No. 51] is **DENIED**.

5.      The parties are directed to file a Joint Status Report on or before **Tuesday, October 20, 2020**.  The Joint Status Report shall include mutually agreeable proposed dates for the trial of this matter and the expected length of trial.  Additionally, the parties shall advise the Court of any relevant *Daubert* issues that remain unresolved due to the MDL Court's decision to reserve ruling.  The parties are directed to provide specific citations to the Joint Designation of Record when discussing any such issues.

Dated: September 29, 2020.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky