UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| REBECCA BURTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5: 20-280-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| ETHICON INC., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the defendants' supplemental motion for summary judgment. [Record No. 100] Specifically, the defendants seek summary judgment with respect to the plaintiff's claims for design defect and negligent infliction of emotional distress. The defendants' supplemental motion for summary judgment will be granted because there is no genuine dispute regarding any material fact and the defendants are entitled to judgment as a matter of law on these claims.

I.

Plaintiff Rebecca Burton consulted Michael Guiler, M.D., in February 2008 with complaints suggestive of pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI").[1] Guiler diagnosed Burton with posterior vaginal prolapse, also known as rectocele, and perineal relaxation. Burton elected to proceed with surgical treatment of these conditions

---

[1] Rebecca Burton's husband Jeffrey Burton has asserted a claim for loss of consortium. However, the defendants' supplemental motion for summary judgment does not involve that claim. Accordingly, any reference to "Burton" or "plaintiff" indicates Rebecca Burton.

- 1 -

and, on February 20, 2008, Guiler repaired the plaintiff's POP using the defendants' Prolift Posterior pelvic mesh kit. Prolift is polypropylene transvaginal mesh with a variable number of mesh arms, depending upon the type of repair being performed.[2] [Record No. 100-2, pp. 13-23] The kit includes pre-cut mesh, a Prolift guide/trocar, varying numbers of Prolift retrieval devices, and Prolift cannulas. *Id.* at p. 20.

Burton went to see Rudolph Tovar, M.D., in April 2013, complaining of pelvic pain, particularly with sexual intercourse. Tovar surgically removed portions of the Prolift mesh on August 23, 2013. He also performed a posterior colporrhaphy to prevent recurrence of the posterior prolapse. Burton reported that her pain was relieved somewhat in the months following surgery. [Record No. 100-3, pp. 12-13]

Burton filed suit against the makers of Prolift on April 21, 2014, alleging she did not realize until 2013 that her symptoms were caused by the polypropylene mesh implant.[3] Among the claims that remain pending are design defect, based in negligence and strict liability, and negligent infliction of emotional distress. The defendants have filed a motion for summary judgment regarding these claims.

## II.

Summary judgment is appropriate if there is no genuine dispute with respect to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

---

[2] There were three separate kits, each designed to treat a specific type of POP: Gynecare Prolift Anterior Pelvic Floor Repair System; Gynecare Prolift Posterior Pelvic Floor Repair System; and Gynecare Prolift Total Pelvic Floor Repair System. [Record No. 100-2, p. 18]

[3] Additional background information is provided in the Court's Memorandum Opinion and Order of September 29, 2020, but this information does not need to be restated here for resolution of the instant motion for summary judgment.

56(a). In other words, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

The moving party has the initial burden to show that there is no genuine issue of material fact, but once the moving party has met its burden, the nonmoving party must demonstrate that there is sufficient evidence from which the jury could render a verdict in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### III.

#### A. Design Defect—Feasible Alternative Design

Kentucky courts apply a risk-utility analysis to assess manufacturers' decisions with respect to the designs of their products. *See Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 535 (Ky. 2003). The trier of fact must employ a balancing test that considers alternative designs and the accompanying risk compared to the risk and utility of the design chosen "to determine whether . . . the manufacturer exercised reasonable care in making the design choices it made." *Id.* (quoting *Toyota Motor Co. v. Gregory*, 136 S.W.3d 35 (Ky. 2004)).

Whether the claim is based in negligence or strict liability, the plaintiff in a design defect case must provide expert testimony "setting forth competent evidence of some practicable, feasible, safer, alternative design." *Estate of Bingham v. DaimlerChrysler Corp.*, 462 F. Supp. 2d 766, 773 (E.D. Ky. 2006); *Toyota Motor Co. v. Gregory*, 136 S.W.3d 35, 41-42 (Ky. 2004) (design defect liability requires proof of feasible alternative design). *See also*

*Stevens v. Keller Ladders*, 1 F. App'x 452, 458 (6th Cir. 2001) (expert testimony required when subject is outside "the grasp of the average lay person").

The plaintiff identifies its only case-specific expert, Dr. Daniel Elliott, as the source of its feasible-alternative-design evidence.[4] [Record No. 102] Dr. Elliott identifies three alternatives that he describes as feasible and safer for Ms. Burton. [Record No. 100-2, p. 63] They are:

> A. The use of sutures, including delayed absorbable sutures like PDS, in a uterosacral ligament suspension and a sacrospinous fixation, a colporrhaphy or an abdominal sacrocolpopexy with mesh or biologic products;
>
> B. Fascia POP repair with Biologics; and
>
> C. A POP repair utilizing a lighter weight, larger pore mesh which does not employ the use of polypropylene mesh arms and/or trocars.

*Id.*

While Dr. Elliott does not provide much explanation concerning these statements, it is clear that the techniques described in A and B are not alternative designs for Prolift. Instead, they are entirely different procedures. *See, e.g., Mullins v. Johnson & Johnson*, 2017 WL 711766, at *2 (S.D. Va. Feb. 23, 2017) (concluding that Burch colpopexy is not an alternative, feasible design in relation to TVT mesh product). As the Court noted previously, evidence of surgical procedures not involving mesh has no bearing on the existence of a safer alternative design for the defendant's Prolift product. [Record No. 83, p. 9 (citing *Owens v. Ethicon, Inc.*, 2020 WL 1976642, at *3 (E.D. Ky. Apr. 24, 2020)].

---

[4]  Elliott also provided general expert reports in *In re: Ethicon, Inc., Pelvic Repair System Products Liability Litigation*, 2: 12-MD-2327 (S.D. W.Va.), from which this case was transferred.

To the extent Elliott proposes sacrocolpopexy with mesh as an alternative, this is "too far removed from the challenged product to constitute an alternative design." *Barnes v. Medtronic, PLC*, 2019 WL 1353880, at *2 (E.D. Mich. Mar. 26, 2019) (rejecting plaintiff's theory that "all polyester hernia meshes are unacceptable" and concluding that proposed alternatives were "alternative treatment methods or alternative types of mesh, not alternative production practices or designs for polyester hernia mesh" under Michigan law); *Hosford v. BRK Brands, Inc.*, 223 So.3d 199, 208 (Ala. 2016) (concluding that, "a design for a different, albeit similar product, even if it serves the same purpose" does not constitute an alternative design under Alabama law).

The plaintiff maintains that the third option identified by Elliott—"a POP repair utilizing a lighter weight, larger pore mesh which does not employ the use of polypropylene mesh arms and/or trocars,"—constitutes sufficient evidence of a feasible alternative design. [Record No. 102, p. 13] The MDL court has already determined that Elliott is *qualified* to offer expert testimony about such matters. The defendants do not dispute that here. Instead, the question is whether the plaintiff has offered *sufficient evidence* of an alternative feasible design such that a jury could find one existed.

Ethicon contends the plaintiff has not—that this proffered "alternative design" is vague and unsupported. The plaintiff disputes this, arguing that Elliott's report "includes seven citations, all from Ethicon-produced documents and depositions of Ethicon employees, to support the following statement about [a POP repair utilizing a lighter weight, larger pore mesh which does not employ the use of polypropylene mesh arms and/or trocars:]"

> Based upon vast amounts of general surgery and basic science literature, there is a consensus that synthetic meshes that are lighter weight, larger pore size, monofilament, and that are capable of maintaining their elasticity and structural

> stability will have better results with fewer complications. Of all the mesh characteristics mesh porosity, mesh pore size and mesh stability under load are the most important. If a mesh product's design does not allow for effective tissue integration and fibrotic bridging occurs, leading to a rigid scar plate, many adverse events can occur such as erosion, nerve entrapment, pain syndromes, dyspareunia, loss of elasticity, mesh contraction, organ dysfunction and the need for reoperation.

*Id. See also* Record No. 100-2, p. 43.

These are all general remarks Elliott made in a portion of his report concerning "foreign body reaction." While Elliott identifies qualities that improve synthetic meshes in general, plaintiffs "must show something more than that it was theoretically probable that a different design would have been feasible." *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 224 (6th Cir. 1996). Indeed, a plaintiff's proof "must include competent evidence of some practicable, feasible, safer, alternative design." *Gray v. Gen. Motors Corp.*, 133 F. Supp. 2d 530, 535 (E.D. Ky. 2001). Additionally, the plaintiff must show that the feasible alternative design would have prevented the plaintiff's injury and could have been practically adopted at the time of the sale. *Dalton v. Animus Corp.*, 913 F. Supp. 2d 370, 375 (W.D. Ky. 2012); *Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 395 (W.D. Ky. 2018) (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 433 (6th Cir. 2007)).

Elliott has not identified any product that meets or approaches the general description he has provided. The court's decision in *In re Davul, Inc.,* 2020 WL 5223363 (S.D. Ohio Sept. 1, 2020) provides a helpful comparison. The plaintiff in that case alleged that Bard's Ventralight ST, (a polypropylene mesh product) was defectively designed. Bard moved for summary judgment, asserting *inter alia* that the plaintiff had not provided sufficient evidence of a safer alternative design. Bard argued that the plaintiff had proposed, at best, "devices of a different class, or devices that were not available at the time of [his] surgery." *Id.* at *8.

Applying Utah law, the court determined that the plaintiff *had* made a sufficient showing of proposed alternative designs to survive summary judgment. The plaintiff's expert noted in her report: "I believe that a safer, feasible alternative product to the Bard products would be a mesh product that had larger pores (to get effective porosity of at least 1 mm), more elasticity to the polymer, used a more appropriate resorbable polymer, and/or was biologic in primary composition." *Id.* at *11.

She continued: "An example of a product that approaches these criteria is Bard Soft, a non-absorbable, low density monofilament polypropylene mesh. . . . Bard also designed, developed and marketed a product that was fully biologic, XenMatrix® AB, 187 comprised solely of noncrosslinked porcine acellular dermal matrix bioprosthetic. . . . Alternative devices include coating of a lightweight polypropylene mesh (28g/m2) with a large pore size (3.8 mm) with a different resorbable polymer that would not result in an acidic environment from its degradation products, such as poliglecaprone, in the UltraPro device by Ethicon." *Id.* The court concluded, "[t]hese alternative designs clearly contemplate the use of mesh and even the use of polypropylene mesh, as well as different formulations of the resorbable coating that is alleged to be defective here." *Id. See Lambert v. G.A. Braun Int'l, Ltd.*, 2016 WL 3406155, at *2-3 (W.D. Ky. June 17, 2016) (granting summary judgment for defendant on design-defect claim when plaintiff did not point to specific evidence showing that alternative design was feasible or that it would have mitigated or prevented the plaintiff's injury).

The plaintiff's conclusory assertion that Elliott's opinion is based on Ethicon-produced documents and depositions of Ethicon employees does nothing to establish that safer

alternative designs were available at the time Burton received the Prolift implant.[5] While plaintiffs are not required to produce a prototype of the alternative design, they must provide sufficiently detailed expert testimony to establish that a reasonable alternative design could have been practically adopted at the time of the sale. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 432-33 (6th Cir. 2007) (citing *Martin v. Michelin North Am.*, 92 F. Supp. 2d 745, 753 (E.D. Tenn. 2000) (applying Tennessee law)); Restatement (Third) of Torts § 2 cmt. f (1998). *See also Arevalo v. Coloplast Corp.*, 2020 WL 3958505 (N.D. Fla. July 7, 2020) (excluding Dr. Bruce Rosenzweig's opinions about alternatives to Exair mesh because did he not provide a reliable methodology for how he reached his conclusions).

Elliott testified during his deposition that, had he treated Ms. Burton in February 2008, he would have offered her posterior colporrhaphy with sutures—not mesh. [Record No. 100-2, pp. 45-46] *See also Wiltgen v. Ethicon, Inc.*, 2017 WL 4467455, at *3 (N.D. Ill. Oct. 6, 2017) (where Elliott testified that "[m]esh should not be placed in the vagina"). Although Dr. Elliott might not be an advocate of vaginal mesh products, that "does not preclude him from comparing or ranking such products." *Id.* at *5. However, the plaintiff has not shown that he attempted to do so in this case. To the extent his case-specific opinion could be considered in conjunction with his general opinions or those of other experts to piece together an opinion regarding alternative designs, the plaintiffs have not articulated any such argument. And it is not the Court's position to make arguments for the parties or to comb the record *sua sponte* in

---

[5] Elliott's report asserts that "many emails and internal documents show that Ethicon was investigating the use of partially absorbable Ultrapro mesh as a short term means to reduce sexual function issues and other complications, even before the time Prolift went to market." [Record No. 100-2, p. 16] However, Elliott does not opine that Ultrapro was a safer alternative to the mesh used in Prolift.

search of factual disputes. *See Reed v. City of Memphis, Tennessee,* 735 F. App'x 192, 201 (6th Cir. 2018). Accordingly, the plaintiff's design-defect claims will be dismissed.[6]

## B. Negligent Infliction of Emotional Distress

Kentucky law precludes plaintiffs from bringing claims for intentional infliction of emotional distress when they have redress for emotional damages through a traditional tort, unless the defendant's conduct was intended only to cause extreme emotional distress in the victim. *Childers v. Geile*, 367 S.W.3d 576, 582 (Ky. 2012). Courts within this district have found the same reasoning applicable to claims for negligent infliction of emotional distress. *See Horn v. City of Covington*, 2015 WL 4042154, at *12 (E.D. Ky. July 1, 2015) (collecting cases). Burton's claim for NIED fails as a matter of law because she has alleged traditional claims upon which she can recover for emotional distress.

Additionally, to bring a claim for NIED, the plaintiff must show "by expert or scientific proof, that the claimed emotional injury is severe or serious." *Osborne v. Keeney*, 399 S.W.3d 1, 6 (Ky. 2012); *Cutter v. Ethicon, Inc.*, 2020 WL 4740472 (E.D. Ky. Aug. 14, 2020). In other words, the plaintiff must show that she "suffered mental distress or an emotional injury, acknowledged by medical or scientific experts, that is greater than a reasonable person could be expected to endure, given the circumstances." *Osborne*, 399 S.W.3d at 6.

---

[6] The defendants also contend that the plaintiff has not presented evidence sufficient to prove that any particular defect in the Prolift device caused her harm. Elliott testified at his deposition that Burton's conditions were "due to the presence of the Prolift arms going through the muscles and the presence of the mesh and the contraction." [Record No. 102-1, p. 40] He further stated, "Through no fault of the implanting surgeon, the resultant reaction and inflammation from the Prolift caused Ms. Burton to suffer vaginal pain, pelvic pain, and severe dyspareunia." *Id.* at p. 62. Because the plaintiff has failed to offer evidence of a feasible alternative design, the Court need not determine whether she has presented sufficient evidence of causation to create a jury question.

The plaintiff has not come forward with expert proof showing that her emotional injury is severe or serious. Burton contends that she has sought treatment for her emotional problems from Dr. Click, her former primary care physician. [Record No. 100-3, p. 37] However, the plaintiffs have not deposed Dr. Click and have been unsuccessful in obtaining records from him. There is no indication that the plaintiffs are able to offer any expert proof regarding Burton's alleged emotional injuries at trial. Accordingly, the defendants are entitled to summary judgment with respect to this claim.

**IV.**

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1. The defendants' supplemental motion for summary judgment [Record No. 100] is **GRANTED**.

2. The plaintiff's claims for design defect and negligent infliction of emotional distress are **DISMSSED** with prejudice.

3. The plaintiff's claims for failure to warn (Count I—negligence; Count III—strict liability; Count XIV—gross negligence); fraudulent concealment (Count VII); unjust enrichment (Count XV); and loss of consortium (Count XVI) remain pending.

Dated: April 30, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky